UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE No. 8:16-CR-269-T-23TGW

RAMIRO MANCILLA-IBARRA

_____

## REPORT AND RECOMMENDATION

The defendant, who was indicted on drug charges, has filed a motion to suppress methamphetamine, his statements, and other evidence obtained in connection with his warrantless arrest (Doc. 30).  An evidentiary hearing established that law enforcement was justified in arresting the defendant without a warrant because there was probable cause to believe that the defendant was delivering to co-defendant Ricky Fann three kilograms of methamphetamine.  Therefore, the arrest of the defendant was permissible, and the evidence the defendant seeks to suppress was obtained lawfully.  Accordingly, I recommend that the Motion to Suppress (Doc. 30) be denied.

I.

At the evidentiary hearing, two witnesses testified on the Government's behalf: Detective Anthony Capo, the co-case agent, and Det. Tellier, a K-9 dog handler with Pasco County Sheriff's Office's Vice and Narcotics Unit (Doc. 61, pp. 6, 7, 90, 92).[1] Defense counsel cross-examined these witnesses. The defendant did not testify, or call any witnesses of his own.

Both parties submitted exhibits, consisting primarily of photographs of the residence of co-defendant Ricky Fann and snapshots of cellular telephone text messages between Fann and the defendant's cellular telephone number (see Docs. 57, 58). During the hearing, the following material evidence was adduced.

Det. Capo, an employee of the Pasco County Sheriff's Office (PCSO) since March 2009, and a member of the Pasco Narcotics Unit since 2011, joined the DEA Task Force 2 in March 2015 (Doc. 61, pp. 6-7). It is a methamphetamine task force (id., p. 7). He testified that the investigation

---

[1]Special agent G. Tucker Cowles was the other co-case agent (Doc. 61, p. 9). Cowles, a DEA employee, has been in law enforcement for 17 years, and submitted the probable cause affidavit in this case (Doc. 1).

of the defendant, Ramiro Mancilla-Ibarra, derived from an investigation of co-defendant Ricky Fann (id., p. 7). Fann had a substantial history for criminal acts involving narcotics. In March 2016, PCSO began video surveillance of Fann's residence, a trailer home on Lake Padgett Drive in Pasco County (Doc. 61, pp. 10, 44-45; Gvt. Ex. 1a). In April 2016, a confidential informant assisted law enforcement with a controlled purchase of methamphetamine at Fann's residence (see Doc. 61, p. 43).[2] Fann was arrested, and then released on bond.

PCSO continued surveillance of Fann's residence, and on the morning of May 15, 2016, Pasco detective Scott Conner reported to Det. Capo that he observed at Fann's residence "a white Kia van with Georgia tags"(Doc. 61, p. 47, 52; Def. Ex. 75). Det. Capo stated that this observation was significant because they suspected that Fann's source of supply was from Georgia (Doc. 61, p. 52). Consequently, law enforcement selected that day to approach Fann to solicit his cooperation with law enforcement (id., pp. 56-

---

[2]This confidential informant was a relative of Fann (Doc. 61, p. 33). He told law enforcement that he met Fann's drug supplier, a person named "Kouranos" from Georgia. He also met an individual named Jeffrey Wiener, who gave Fann $140,000 for the purchase of methamphetamine (Doc. 61, pp. 34-35, 52, 53).

57). PCSO officers stopped Fann's vehicle for a traffic infraction, after which Det. Capo and the co-case agent talked to Fann (id.).

Fann, who was advised of his Miranda rights, agreed to speak with law enforcement (id.). Fann stated that he had been selling methamphetamine, in large amounts, for a long time (id., pp. 57-58). Fann also consented to law enforcement's search of his residence (id., p. 57).

When the task force officers entered Fann's residence, Fann turned over more than $11,000 in drug proceeds (id., p. 66). Members of the task force also discovered methamphetamine in the attic of Fann's bedroom which, by its packaging, appeared ready for distribution (id., p. 12, 15, 66; Def. Ex. 2(k)). Det. Capo spoke further with Fann, who opened a wall inside his bedroom where more methamphetamine was stored (Doc. 61, pp. 12, 16, 66; Def. Ex. 2(l)). Additionally, Fann turned over to law enforcement a black zippered bag containing over $10,000 that had been concealed within the couch (Doc. 61, pp. 12-13; Gvt. Exs. 2(b), (e), (k)(l)). Fann told Det. Capo that the source of his methamphetamine supply was named Benny, and that his source operated out of Georgia and drove a white van (Doc. 61, pp. 17-18). Fann said that he communicated with his source of supply through text

messages (id., p. 18). Fann gave consent for law enforcement to examine the contents of the cellular telephone, and to use the telephone (id.)

Additionally, Fann identified Jeffrey Wiener as an individual involved in trafficking methamphetamine (id., p. 67). Fann elaborated that he had lost money that belonged to Wiener and, consequently, when Wiener paid Fann for methamphetamine, Wiener would retain some of the money to pay down Fann's debt to him (id.). The following day, the DEA task force conducted, with Fann's assistance, a successful reverse sting on Wiener (id., pp. 68, 75-76, 88-89).[3]

On May 23, 2016, the DEA task force contacted Fann at the Pinellas County Jail, where Fann was detained, in order to arrange a controlled methamphetamine transaction with Fann's source of supply (Doc. 61, pp. 20, 77). Fann told Det. Capo that he normally ordered methamphetamine, in kilogram quantities, by text message to his source of supply at "4706952708," which was a contact number in Fann's cellular telephone (Doc. 61, pp. 19, 63-64; 73, 74; Gvt. Ex. 5(a)).

---

[3]The Government elaborated in its opposition memorandum that the reverse drug sting involved the delivery of what was purported to be a kilogram of methamphetamine. It resulted in the seizure of over $50,000, and Wiener's indictment (Doc. 37, p. 4, n.1; Doc. 65, p. 4, n.1).

At 1:31 p.m., Fann sent a text message to the alleged source of supply which stated, "I need three my friend" (see Gvt. Ex. 5(b)). Det. Capo testified that "three" was a code word for three kilograms of methamphetamine (Doc. 61, p. 79). Det. Capo elaborated on this text message during the following exchange with Government counsel (id., p. 22):

> Q: Did Mr. Fann describe in what manner he would order the methamphetamine?
> A: He did. When he sent his text message, he advised this was a normal procedure he would go through to order the kilo quantities of methamphetamine from the source of supply.
> Q: Did you advise Mr. Fann to order three kilograms?
> A: ....He said...that would be within the norm.
> Q: So based on your training, experience, and knowledge of this investigation, what did you understand I need three, my friend, to mean in this context?
>
> ....
>
> A: Three kilos.

The text message recipient responded, "Ok buddy," and "I leave at 8:00 PM today" (id., pp. 23-24; Gvt. Ex. 5(c)(d)).

Det. Capo took over text communications and replied, "Ok my friend" (Doc. 61, p. 73). On the night of May 23, 2016, and into the morning

of May 24, 2016, the following text messages were exchanged with the

alleged source of supply (Doc. 61, p. 24; Def. Ex. 6):

> Received [by Det. Capo using Fann's cellular
> telephone] 10:54 PM: "Be there 7:00 or 7:30 my
> friend good nice see you 7"
> Received: 10:56 PM–"Ok"
> Sent [by Det. Capo using Fann's cellular
> telephone] 10:56 PM: "Ok see you at 7 my friend"
> Received 10:58 PM: "Ok my friend"
> Sent 10:58 PM:"Text me when you close so Ill be
> ready my friend"
> Sent 6:47 AM:"Opened the gate for you my friend"
> Received 7:16 AM: "I stopped to sleep my friend
> take shower and go ahead"
> Sent 7:25 AM:"Ok gettin something to eat soon let
> me know my friend"
> Received 7:26 AM:"Ok my friend"
> Sent 11:13 AM: You good my friend?"
> Received 11:14 AM: "Yea"

At 11:18 a.m., a text message from the alleged source of supply

stated, "3:30 be there sure" (Doc. 61, p. 25; Def. Ex. 6). Det. Capo stated, at

that point, he was at Fann's residence "[w]aiting for a supplier to arrive to

presumably drop off methamphetamine" (Doc. 61, p. 25). Other members

from the Task Force were also present, and law enforcement units were

outside the residence "[t]o conduct surveillance if the white Kia van showed

back up to the residence or [it] looked like the Kia van was en route to the residence" (Doc. 61, pp. 25-26).

At 2:06 p.m., the alleged source of supply sent the message, "10 min," to which Det. Capo responded, "Ok see you soon my friend" (Def. Ex. 6). The following text messages were then exchanged with the alleged source of supply (id.):

> Received 2:10 PM: "Ok"
> Received 2:16 PM: "you there"
> Sent 2:17 PM: "Yes gate open my friend"
> Received 2:18 PM: "Ok"

A task force officer advised that, minutes later, a white van headed toward the residence with "the Georgia tag which we were looking for" (Doc. 61, p. 28). The white van pulled into the driveway of Fann's residence, through the gate, and into the backyard (id., p. 81).

There were several officers present when the vehicle stopped, some of whom had their guns out (id., pp. 82, 84). The defendant was removed from the car, placed on the ground, and handcuffed (id., pp. 29, 84). Det. Capo stated that the officers had safety concerns because the defendant was suspected of drug trafficking, and they did not know whether he would try to run someone over, or fight being detained (id., p. 82).

The defendant was then taken inside Fann's residence, and read his Miranda rights in Spanish (id., p. 85). Det. Capo stated that they brought the defendant inside the residence because they wanted to get him away from the vehicle in order to conduct the dog sniff, and because he "thought [the defendant] would be more comfortable inside the residence" (id., pp. 85, 86).

Detective Adam Tellier, the canine handler, testified that he and K-9 Brasko were waiting a couple of blocks away when he learned that the white van was at Fann's home (id., pp. 92-94). Det. Tellier arrived at Fann's residence a couple of minutes later and, after making sure the scene was secure, Det. Tellier had Brasko sniff around the vehicle (id., pp. 94-95). Det. Tellier stated that the air sniff took as long as it takes "to walk around the car" (id., p. 95). He stated that Brasko alerted to the presence of narcotics by the front door and at the vehicle's back quarter panel (id.). Task Force Officer Justin Lee discovered during the search of the vehicle approximately three kilograms of methamphetamine in the rear inner quarter panel of the van (id., p. 30).

In June 2016, the defendant, and co-defendant Ricky Fann, were indicted in federal court on charges of conspiracy, and possession, with intent

to distribute, a substance containing a detectable amount of methamphetamine

(Doc. 9).  The defendant has moved to suppress all evidence gathered in

connection with his arrest on the ground that he was subjected to an illegal

warrantless arrest and that all evidence subsequently obtained by law

enforcement was the "fruit of the poisonous tree" (Doc. 30; Doc. 60).

Specifically, the defendant seeks an Order suppressing (Doc. 30, p. 1):

> (1) any and all items seized after Defendant was placed under arrest, including but not limited to the narcotics (described as 3.1 kilograms of methamphetamine), the vehicle (Kia van), and his cellular telephone (white Samsung) and the contents thereof;
> (2) any and all statements made by the Defendant after he was placed under arrest; and
> (3) any and all other evidence constituting fruit of the poisonous tree, including but not limited to the information obtained from the use of a K-9 unit with Defendant's vehicle and knowledge acquired from calling Defendant's cellular telephone and looking at the screen.

The Government asserts that the defendant's warrantless arrest

was legal because there was probable cause to believe that the defendant was

delivering three kilograms of methamphetamine to Fann (Doc. 37, p. 2).

Alternatively, the Government argues it was permissible for law enforcement

to stop the vehicle briefly to conduct a dog sniff because law enforcement had

reasonable suspicion to believe that there was methamphetamine in the vehicle (Doc. 65, p. 5).

The motion to suppress was referred to me for a report and recommendation (Doc. 32). Subsequently, an evidentiary hearing was held on the matter (see Doc. 39). Both parties, with leave of court, submitted post-hearing memoranda (Docs. 60, 65).

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. Amend. IV. A warrantless arrest is constitutionally valid only when there is probable cause to arrest. United States v. Watson, 423 U.S. 411, 417 (1976).

"Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992).

The United States Supreme Court elaborated (Illinois v. Gates, 462 U.S. 213, 231-32 (1983) (citations omitted)):

> In dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.  As these comments illustrate, probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.

Additionally, "in making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Id. at 242.

The Eleventh Circuit assesses the "totality of the circumstances" in determining whether an informant's tip rises to the level of probable cause. Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996).   Those circumstances include the informant's veracity, reliability, basis of knowledge, and whether the cooperator's statements were against his penal

-12-

interest. Id. Furthermore, "the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis." Id. A deficiency in one of these areas may be compensated by a strong showing in another.  United States v. Grice, 335 Fed. Appx. 924, 926 (11th Cir. 2009).   Additionally, "[i]n examining the totality of the circumstances, a reviewing court must give due weight to the officer's experience." United States v. Brown, 203 Fed. Appx. 997, 999 (11th Cir. 2006).

Moreover, it is noted that "innocent behavior frequently will provide the basis for showing of probable cause." United States v. Gonzalez, 969 F.2d 999, 1003 (11th Cir. 1992) (quoting Illinois v. Gates, 462 U.S. at 243, n.13).  Thus, "[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer." Id. at 1004. Consequently, "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." Illinois v. Gates, supra, 462 U.S. at 243, n.13.

III.

The Government argues meritoriously that the warrantless arrest of the defendant was legal because there was probable cause to believe that the defendant was Fann's source of supply who was delivering to Fann three kilograms of methamphetamine (Doc. 37, p. 2). As indicated, informant Ricky Fann provided to law enforcement first-hand knowledge of the defendant's participation in methamphetamine trafficking that was corroborated, in part by independent police work, and contemporaneously with Fann's participation in the controlled methamphetamine transaction that resulted in the defendant's arrest. See Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009) (law enforcement is entitled to rely on allegations of an informant and corroborating evidence as probable cause for a warrantless arrest).

Thus, Fann, a drug dealer who had been set up in a drug sting the previous month, agreed, against his penal interest, to cooperate with law enforcement. After turning over methamphetamine and drug proceeds to law enforcement, and identifying another drug trafficker, Fann agreed to cooperate in a controlled methamphetamine transaction with his source of

-14-

supply. Fann sent a text message to the alleged source of supply stating, "I need three my friend," which Det. Capo reasonably understood, based on his training, experience, and knowledge of this investigation, to mean three kilograms of methamphetamine.

The following day, law enforcement observed a "white van with the Georgia tags pull[] up" to Fann's residence (Doc. 61, p. 81). The belief that the driver of this vehicle was the source of supply was corroborated by the arrival of the vehicle at the time stated in the alleged source of supply's text message; Fann's earlier statement that his source of supply was from Georgia and had a white van; and law enforcement's observation of a white Kia van with Georgia tags at Fann's residence on May 15, 2016, the day it previously seized methamphetamine from Fann's residence.

In sum, the totality of these circumstances would lead an objectively reasonable law enforcement officer to believe that there was a fair, if not high, probability, that the person in the white van was delivering methamphetamine to Fann. See Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide

whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.").

The government correctly asserts that this is not even a close call (Doc. 65, p. 5). Therefore, the defendant's arrest was supported by probable cause and was not a violation of the defendant's Fourth Amendment rights.

The defendant argues that there was not probable cause for his arrest. He contends that "[t]he Government cannot, under the applicable case law, effectuate a warrantless arrest based on the information provided by a person such as Fann" (Doc. 60, p. 15). In this regard, the defendant argues that "Fann had an extensive and consistent pattern of committing crimes, even while he was on court-ordered supervision" which shows that Fann was an "unreliable and untrustworthy" informant (id., p. 14).

It is undisputed that Fann has a substantial criminal record. However, "an informant's criminality does not in itself establish unreliability." United States v. Taylor, 471 F.3d 832, 840 (7th Cir. 2006); see also United States v. Mandujano, 425 U.S. 564, 573 (1976).

Thus, many confidential informants with criminal records have provided reliable information which has furthered investigations and, as the

Supreme Court noted, "[s]ince the subject matter of the inquiry is crime...it is unrealistic to assume that all of the witnesses capable of providing useful information will be pristine pillars of the community untainted by criminality." United States v. Mandujano, supra, 425 U.S. at 573.

In this matter, there are several circumstances which show that, despite Fann's criminal history, law enforcement's reliance on information provided by Fann was reasonable.  See Ortega v. Christian, supra, 85 F.3d at 1525 (the "totality of the circumstances" are considered in determining whether an informant's tip rises to the level of probable cause).

Thus, law enforcement was aware that Fann, a methamphetamine dealer, had first-hand knowledge of his source of supply, and other relevant information related to methamphetamine trafficking.   United States v. Gonzalez, supra, 969 F.2d at 1003 (source of informant's knowledge is considered in determining the reliability of that information).  Furthermore, when Fann agreed to cooperate with law enforcement, he made admissions regarding his methamphetamine trafficking, and consented to the search of his residence, which led to law enforcement's seizure of three kilograms of methamphetamine and thousands of dollars in drug proceeds.   He also

truthfully identified another methamphetamine trafficker. Thus, Fann's actions against his penal interest support a reasonable belief that Fann was, at that point, providing reliable information to law enforcement because his cooperation could benefit him, whereas giving law enforcement false leads would harm Fann's interests.[4] See United States v. Harris, 403 U.S. 573, 584 (1971) (admissions against penal interest may carry their own indicia of credibility).

Additionally, details of Fann's information were corroborated through independent police work. See Ortega v. Christian, supra, 85 F.3d at 1525 ("the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis"). Thus, Fann's statement that his source of supply was from Georgia, and had a white van, was corroborated by law enforcement's surveillance of a white Kia van with Georgia plates at Fann's residence on May 15, 2016, the day it seized three kilograms of methamphetamine from Fann's residence. Further, Fann gave accurate information that Jeffrey

---

[4]Fann signed a plea agreement which includes a cooperation provision (Doc. 37, p. 4, n.2).

Wiener trafficked in methamphetamine, which law enforcement verified with Fann's assistance in a reverse sting operation.

Moreover, the credibility of Fann's information was borne out during the controlled methamphetamine transaction. Thus, the text messages succinctly laid out an agreement with the recipient of the text messages for what, in the detective's training, experience, and knowledge of the investigation, was a request for three kilograms of methamphetamine. The arrival of a white Kia van with Georgia plates, at the time the alleged source of supply stated that he would arrive with "three," corroborated the veracity of Fann's information.

These circumstances show that Fann's criminal background was not dispositive of whether he was a reliable informant and, contrary to the defendant's argument, law enforcement did not simply rely on Fann's word to establish probable cause for the defendant's arrest.[5]

---

[5]Defense counsel asserts that the court "commented that the method by which Fann obtained his narcotics was also irrelevant to the issue before it" (Doc. 60, p. 8). This is inaccurate. Defense counsel asked Det. Capo "did [Fann] tell you anything about his method of operation, meaning who sold for him, who he delivered to?" (Doc. 61, p. 58). The Government objected to this question, and I upheld the Government's objection to the extent that, "We don't care about what [Fann] is doing in terms of selling, it's the other end we are talking about" (id.).

The defendant also argues that "the law enforcement officers knew or should have known ... Fann had made a materially false statement to them" when Fann said that his source of supply was Benny, because law enforcement were previously told by a reliable confidential informant that Fann's source of supply was "Kouranos" (Doc. 60, p. 15). This contention is unavailing. The source of supply could go by more than one name, or change the name by which he is referred. Moreover, Fann could have had more than one source of supply.

In all events, this purported discrepancy did not compel law enforcement to discredit Fann as an informant because Fann had already provided significant information that was proven credible, they did not know the name Benny was false, and law enforcement was not simply accepting Fann's word, but continued to monitor the reliability of his information as the controlled methamphetamine transaction unfolded.

The defendant additionally argues that "it was not objectively reasonable for law enforcement to believe that the information Fann provided regarding the use of his cellular telephone to place orders for narcotics was

credible or reliable" because "I need three my friend" is an "innocuous text message" (Doc. 60, p. 16).  This contention is meritless.

Thus, what appears to be "innocent behavior frequently will provide the basis for a showing of probable cause."   United States v. Gonzalez, supra, 969 F.2d at 1003.  Here, Det. Capo testified that Fann told him that the text message, "I need three my friend" was his normal method for ordering methamphetamine.  Det. Capo testified further that, based on his training, experience, and knowledge of the case, he understood "I need three my friend" was code for three kilograms of methamphetamine.  See United States v. Brown, supra, 203 Fed. Appx. at 997 (due weight to be given law enforcement's experience and training in drug crimes).[6]

---

[6]The defendant, reciting the factors in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993) makes the conclusory assertion that Det. Capo's opinion may not be considered because it "does not bear the necessary indicia of reliability for the Court to rely upon it" (Doc. 60, p. 16).  However, the list of specific factors in Daubert "neither necessarily, nor exclusively applies, to all experts or in every case." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999).  Furthermore, in this matter, the Daubert factors do not provide the same gatekeeping function they were intended to because the court is the factfinder.  In this regard, I find that Det. Capo's experience and training as a narcotics detective, and his knowledge of this case, including Fann's statement to him that "I need three my friend" was his normal method for ordering three kilograms of methamphetamine, amply qualify him to give his opinion on this issue.

Significantly, when I read in the pre-hearing memoranda the statement "I need three," it was clear to me that what was being requested was a delivery of three kilograms of drugs. At that point, I thought that an evidentiary hearing was not necessary. I went forward because that is what I was requested to do. The evidence at the hearing simply confirmed my original thought.

Furthermore, there is nothing about Fann's representation regarding his method of ordering methamphetamine that should have prompted law enforcement's suspicion as to the veracity of that statement. Thus, the use of coded language is not uncommon in drug transactions. See United States v. Griffith, 118 F.3d 318, 321 (5th Cir. 1997) ("it is not unusual for drug traffickers to attempt to conceal from outsiders, through deliberate obscurity, the illegal nature of the activities being discussed"); United States v. Cooper, 868 F.2d 1505, 1513 (6th Cir. 1989) ("The use of jargon and code words is a frequent practice in narcotic dealings."). Notably, the text message recipient clearly understood the meaning of this cryptic message, as he obliquely replied "ok," and "I leave at 8 pm today." Thus, the text messages indicate suspicious activity, as the parties avoid identifying the subject matter

of their conversation, and the text message recipient indicates that he is traveling a significant distance, with little notice, to deliver "three" (see Def. Ex. 6, DISC-00049 ). See Illinois v. Gates, supra, 462 U.S. at 243, n.13 ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.").

Additionally, the defendant argues that "Fann provided inaccurate and misleading information about both his source of supply and the method by which he obtained/ordered the narcotics" because "[i]f Defendant was his supplier, there would have been videos or pictures of him at the residence" (Doc. 60, p. 17). This argument is meritless. As discussed supra, the totality of the circumstances supported the reliability of the information provided by Fann. The contention that video or pictures of the defendant were necessary misapprehends the evidence required to establish probable cause. See Illinois v. Gates, supra, 462 U.S. at 243, n.13 ("probable cause requires only a probability or a substantial chance of criminal activity, not an actual showing of such activity").

Importantly, if the defendant thought that any of Det. Capo's testimony was not accurate, he could have testified to the contrary. His testimony at the suppression hearing could not be used against him at trial. See United States v. Quesada-Rosadal, 685 F.2d 1281, 1283 (11th Cir. 1982) (testimony given by a defendant at a hearing on a motion to suppress is not admissible at trial on the issue of guilt). However, he gave no testimony, and, thus, Det. Capo's testimony stands unchallenged.

In sum, the testimony at the suppression hearing establishes that the warrantless arrest of the defendant was lawful because, under the totality of the circumstances, law enforcement reasonably believed that there was more than a fair probability that the defendant was delivering methamphetamine to Fann.

Furthermore, because the evidence establishes that there was probable cause to arrest the defendant, the defendant's argument is moot that all evidence obtained following the warrantless arrest constitutes "fruit" of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). Similarly, in light of the finding of probable cause, it is unnecessary to consider the government's more difficult alternative argument that "there was

reasonable and articulable suspicion to stop [the defendant's vehicle,] and the K-9's alert to narcotics in the van provided probable cause to search" (Doc. 65, p. 5).

IV.

In sum, the defendant argues that the drugs found inside his vehicle when he arrived at Fann's residence on May 24, 2016, and all other evidence and statements, must be suppressed because they were discovered pursuant to a warrantless arrest. However, the arrest was lawful because the officers had probable cause to believe that the defendant was delivering three kilograms of methamphetamine to Fann. I therefore recommend that the defendant's Motion to Suppress (Doc. 30) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 25, 2017

NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's

right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.